**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
--------------------------------------------------------x
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Plaintiff,

v.

                                   **DEMAND FOR JURY TRIAL**

PRECIOUS PHYSICAL THERAPY, INC.;
STERLING PHYSICAL THERAPY
PROVIDER CORP.;
CORE PHYSICAL THERAPY CORP.;
HEMALKUMAR MADHUSUDAN
BHAGAT; PAYAL HEMAL BHAGAT;
KHALID GAZGUZ;
HANSEE SESI; and SALWA ELIA,

      Defendants.
--------------------------------------------------------x

## COMPLAINT

State Farm Mutual Automobile Insurance Company ("State Farm Mutual"), for its complaint against defendants Precious Physical Therapy, Inc. ("Precious"); Sterling Physical Therapy Provider Corp. ("Sterling"); Core Physical Therapy Corp. ("Core"); Hemalkumar Madhusudan Bhagat ("Hemal Bhagat"); Payal Hemal Bhagat ("Payal Bhagat"); Khalid Gazguz ("Gazguz"); Hansee Sesi ("Sesi"); and Salwa Elia ("Elia") (collectively, "Defendants"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action involves a fraudulent scheme to obtain money from State Farm Mutual by submitting, or causing to be submitted, bills and supporting documentation that are fraudulent for services purportedly provided to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services either are not performed or are not performed because they are medically necessary.   Instead, the services, if performed at all, are performed pursuant to a predetermined treatment protocol (the "Predetermined Protocol") that is designed and carried out to enrich Defendants by exploiting the patients' eligibility for No-Fault Benefits, and not to address the unique circumstances and needs of any individual patient.

2.    The Predetermined Protocol, which has been implemented and carried out by Hemal Bhagat and Payal Bhagat across three different physical therapy clinics operating out of the same office location – Precious, Sterling, and Core (hereinafter, the "Clinics") – includes:  (a) failing to legitimately evaluate patients to determine the true nature and extent of their injuries and to arrive at a legitimate treatment plan to address their true needs; (b) reporting the same or similar findings for all patients to justify a predetermined course of treatment, regardless of any information provided by the patients' referring providers in prescriptions for

physical therapy or the length of time between the patients' motor vehicle accidents and their first visit to the Clinics; (c) implementing a predetermined course of treatment that consists of at least the same four passive modalities and at least one or two nondescript active modalities to almost every patient on almost every visit, regardless of the unique circumstances and needs of each patient; and (d) submitting documentation to State Farm Mutual that falsely represents the evaluations and treatments purportedly provided to patients were legitimately performed and medically necessary when, in fact, they either were not provided or were provided pursuant to the Predetermined Protocol and not to address the patients' unique circumstances and needs.

3.     Hemal Bhagat and Payal Bhagat also purport to perform re-evaluations of the Clinics' patients approximately every few weeks, but, as with the initial evaluations described above, these re-evaluations are not designed and performed for a legitimate diagnostic or treatment purpose.  Instead, the re-evaluations are simply a pretext to document that patients are still injured, have not fully met their short- or long-term treatment goals, and require additional physical therapy, which is ultimately provided pursuant to the Predetermined Protocol, and not because such treatment is medically necessary.

4.     As a result of the Predetermined Protocol, patients are not legitimately evaluated and treated.

5.    Accordingly, because the above-described services were performed, if at all, pursuant to the Predetermined Protocol, the bills and supporting documentation submitted to State Farm Mutual for those services, described, in part, in the charts attached hereto as Exs. 1, 2A, 2B, 3A, and 3B, are fraudulent and the charges for those services are not owed because the treatment is not medically necessary.

6.    Defendants Hemal Bhagat, Payal Bhagat, Precious, Sterling, and Core (collectively, the "Provider Defendants") have made material misrepresentations to conceal their fraud from State Farm Mutual.   The bills and supporting documentation for each patient, when viewed in isolation, do not reveal their fraudulent nature.   Only when the bills and supporting documentation across all claims at issue are viewed together do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

7.    The Provider Defendants' fraudulent scheme began at least as early as January 2016, and has continued uninterrupted since that time.   As a direct and proximate result of the scheme, State Farm Mutual has incurred actual damages of at least $1.8 million in No-Fault Benefits paid to the Clinics.

8.    This action asserts common law causes of action for fraud and unjust enrichment to recover actual damages of more than $1.8 million in No-Fault Benefits paid to the Clinics.   This action also seeks a declaratory judgment that

4

State Farm Mutual is not liable for any pending unpaid bills submitted by or on behalf of the Clinics to date and through the trial of this case based upon the above-described conduct.

9.     State Farm Mutual has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association, or any other source for any of the charges at issue in this case.

## II.     JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. § 1332(a)(3), this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states and in which a citizen of a foreign state (Hemal Bhagat) is an additional party.

11.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because this is the jurisdiction where a substantial part of the events or omissions that gave rise to the claims occurred here.

## III.    PARTIES

### A.    Plaintiff

12.     State Farm Mutual is a citizen of Illinois.  It is a corporation organized under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  At all relevant times, it was licensed in Michigan to engage in the business of insurance.

**B.**     **Defendants**

**1.**     **The Physical Therapists**

**a)**     **Hemal Bhagat**

13.     Hemal Bhagat is a citizen of India and a lawful permanent resident of the United States.  He is currently incarcerated, and he resides at Moshannon Valley Correctional Center in Philipsburg, Pennsylvania.   Prior to his incarceration, Hemal Bhagat resided in Michigan and conducted business in Michigan.  He was licensed to practice physical therapy in Michigan from January 2009 until February 2017, when his license was suspended and subsequently revoked by the Michigan Department of Licensing and Regulatory Affairs ("LARA").

14.     In January 2013, Hemal Bhagat and several co-conspirators were indicted for (1) health care fraud conspiracy in violation of 18 U.S.C. § 1349; (2) health care fraud in violation of 18 U.S.C. §§ 1347, 2; (3) conspiracy in violation of 18 U.S.C. § 371; (4) money laundering conspiracy in violation of 18 U.S.C. § 1956(h); and (5) forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7), and 28 U.S.C. § 2461.

15.     According to the indictment, from May 2009 through October 2011, Hemal Bhagat participated in a fraud scheme in which he and his co-conspirators submitted bills and documentation to Medicare from multiple home health

agencies for fabricated or medically unnecessary physical therapy and other services.

16.     The indictment alleged that, as part of the alleged scheme, Hemal Bhagat prepared fraudulent physical therapy evaluations, supervisory visit notes, and patient discharge forms to falsely reflect that physical therapy and home health care services billed to Medicare were actually provided and medically necessary, when they were not.   Hemal Bhagat also allegedly offered and paid illegal kickbacks to patient recruiters and physicians to increase the number of services he and his co-conspirators were able to charge Medicare.

17.     On August 14, 2013, Hemal Bhagat pleaded guilty to one count of the indictment – conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349.  In his plea agreement, Hemal Bhagat admitted to creating "fictitious therapy files that appeared to document physical therapy and other services provided to Medicare beneficiaries, when in fact no such services had taken place." Ex. 4 at 3. Additionally, Hemal Bhagat admitted to signing false "physical therapy evaluations, supervisory patient visits, and patient discharge forms, that facilitated [the home health agencies'] ability to bill Medicare for home health visits[,]" for which he was paid $300 per patient packet.  *Id.*  The plea agreement provided, among other things, that "[t]he Court shall order restitution to every identifiable victim of [Hemal Bhagat's] offenses," and identified his lone victim as the U.S.

Department of Health and Human Services and the amount to be repaid as more than $4.7 million.  *Id.* at 9-10.  Hemal Bhagat further agreed to forfeit "any assets he has now, or may later acquire" to satisfy the money judgment.  *Id.* at 16.  Thus, the terms of his plea agreement provided Hemal Bhagat with an incentive to avoid acquiring, among other things, any ownership interest in any entity while awaiting sentencing.

18.    After entering his guilty plea, from in or about August 2013 through July 2016, Hemal Bhagat worked as a physical therapist at several clinics in Michigan.  From January 2016 through at least July 2016, Hemal Bhagat provided physical therapy services to Precious and later Sterling patients in accordance with the Predetermined Protocol, and thus he conducted the fraudulent activities at issue and caused damages to State Farm Mutual in the state of Michigan.

19.    In November 2016, Hemal Bhagat was sentenced to 30 months imprisonment and ordered to pay over $4.7 million in restitution for his role in fabricating physical therapy and home health care records and submitting fraudulent bills to Medicare.

### b)    Payal Bhagat

20.    Payal Bhagat resides in and is a citizen of Michigan.  Payal Bhagat has been licensed to practice physical therapy in Michigan since 2006.

21.    Payal Bhagat is married to Defendant Hemal Bhagat.   In sworn deposition testimony provided in December 2017, Payal Bhagat denied knowing Hemal Bhagat.  Ex. 5 at 53.  Later in that deposition, after being asked specifically whether Hemal Bhagat was her husband, Payal Bhagat conceded she did know him and claimed they were recently divorced.  *Id.* at 54.  On information and belief, Hemal Bhagat and Payal Bhagat remain married, and neither party has initiated divorce proceedings.

22.    According to Articles of Incorporation filed with LARA, Payal Bhagat incorporated Sterling along with Gazguz and Sesi in April 2016.  During her deposition in December 2017, Payal Bhagat denied having any ownership interest in Sterling.  *Id.* at 10.  During an earlier deposition in February 2017, however, Payal Bhagat admitted to having a 34 percent ownership interest in Sterling, and she explained that Gazguz and Sesi offered her an ownership interest in Sterling as an incentive to join the clinic as a physical therapist. Ex. 6 at 14-16. In addition to owning Sterling, Payal Bhagat also directed Sterling's activities and the activities of those who were employed by and associated with Sterling.  After her husband, Hemal Bhagat, ceased providing physical therapy services in or about July 2016, she began to provide services for Sterling patients in accordance with the Predetermined Protocol.

23.     After Sterling ceased operations in or about January 2017, Payal Bhagat incorporated Core with Elia to continue providing physical therapy services at the same office location and for many of the same patients as Sterling.  Payal Bhagat testified at her deposition in February 2017 that she is an owner of Core. Ex. 6 at 21.  Payal Bhagat has also directed Core's activities and the activities of those who are employed by and associated with Core, and provides physical therapy services to Core patients in accordance with the Predetermined Protocol.

### 2.     The Physical Therapy Clinics

#### a)     Precious

24.     Precious is a Michigan corporation formed in January 2016, with its principal place of business at 33424 Dequindre Road, Suite A, Sterling Heights, Michigan 48310.   It is a citizen of Michigan and its registered agent and incorporator is Jamal Jamil.  Jamal Jamil resigned as Precious's registered agent on August 25, 2017.

25.     From at least January 2016 through April 2016, Hemal Bhagat performed physical therapy services for Precious patients, and Precious knowingly submitted, and caused to be submitted, bills and supporting documentation described, in part, in the charts attached hereto as Exs. 1, 2A, and 2B, which are fraudulent in that they represent services were actually rendered and were medically necessary when, in fact, they either were not performed or were

performed pursuant to the Predetermined Protocol that was designed and carried out to exploit the patients' No-Fault Benefits and enrich Precious and its owner(s).

26.    In or about April 2016, Precious ceased providing physical therapy services for its patients, at which time Sterling opened in the same location and many of Precious's patients continued treating with Hemal Bhagat at Sterling.

### b)    Sterling

27.    Sterling is a Michigan corporation formed in April 2016, with its principal place of business at 33424 Dequindre Road, Suite A, Sterling Heights, Michigan 48310.  It is a citizen of Michigan and is owned by Payal Bhagat, Gazguz, and Sesi.

28.    From at least April 2016 through December 2016, Hemal Bhagat and later Payal Bhagat performed physical therapy services for Sterling patients and Sterling knowingly submitted, and caused to be submitted, bills and supporting documentation described, in part, in the charts attached hereto as Exs. 1, 2A, and 2B, which are fraudulent in that they represent services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to exploit the patients' No-Fault Benefits and enrich Sterling and its owners.

29.    On or about January 2017, Sterling ceased providing physical therapy services for its patients, at which time Payal Bhagat and Elia opened Core in the

same location and many of Sterling's patients continued their treatment with Payal Bhagat at Core.  Additionally, multiple employees of Sterling continued working at Core after it opened.

### c)     Core

30.     Core is a Michigan corporation formed in January 2017, with its principal place of business at 33424 Dequindre Road, Suite A, Sterling Heights, Michigan 48310.  It is a citizen of Michigan, and it is owned by Payal Bhagat and Elia.

31.     From at least January 2017 to the present, Payal Bhagat has performed physical therapy services for Core patients and Core has knowingly submitted, and caused to be submitted, bills and supporting documentation described, in part, in the charts attached hereto as Exs. 1, 3A, and 3B, which are fraudulent in that they represent services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to exploit the patients' No-Fault Benefits and enrich Core and its owners.

### 3.     The Other Clinic Owners

### a)     Khalid Gazguz

32.     Gazguz resides in and is a citizen of Michigan.  Sterling's Articles of Incorporation list Gazguz as its resident agent and one of its incorporators.  Ex. 7 at 2.  According to Payal Bhagat's deposition testimony from February 2017, Gazguz

was an owner of Sterling from at least April 2016 through December 2016, *see* Ex. 6 at 14-16, during which time he profited from Sterling's fraudulent activities.

### b)   Hansee Sesi

33.   Sesi resides in and is a citizen of Michigan.  Sterling's Articles of Incorporation list Sesi as one of its incorporators.  Ex. 7 at 2.  According to Payal Bhagat's deposition testimony from February 2017, Sesi was an owner of Sterling from at least April 2016 through December 2016, *see* Ex. 6 at 14-16, during which time he profited from Sterling's fraudulent activities.

### c)   Salwa Elia

34.   Elia resides in and is a citizen of Michigan.

35.   Elia and Payal Bhagat are neighbors and have known each other since 2016.

36.   According to her deposition testimony from May 2018, Elia was employed as a manager at Sterling from March 2016 through January 2017.  Ex. 8 at 12.  As a manager, Elia contacted patients, helped schedule appointments, and performed marketing activities, including distributing business cards at doctors' offices.  *Id.* at 12-13.  After Sterling closed, Elia continued to work as a manager at Core.  *Id.* at 20.

37.   Elia further testified in her May 2018 deposition that she has been an owner of Core from at least January 2017 to the present, during which time she has

profited from Core's fraudulent activities. *Id.* at 21, 24-25. Specifically, Elia testified that she holds a 49 percent ownership interest in Core, while Payal Bhagat holds a 51 percent ownership interest in the clinic. *Id.* at 25. Core's Articles of Incorporation list Elia as one of its incorporators.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    First-Party Claims for Payment under the No-Fault Act

38.    Under Michigan's No-Fault Act, insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle." MCL §§ 500.3105, 3107(1)(a).

39.    For the reasons described herein, the Provider Defendants knew that the charges at issue in this complaint were not for reasonably necessary medical services for an injured person's care, recovery, or rehabilitation, and therefore those charges were not owed.

### B.    The Legitimate Treatment of Patients with Soft Tissue Injuries

40.    The Provider Defendants purport to evaluate and treat patients who have been in auto accidents and complain of neck and/or back pain, among other symptoms.

41.    For patients who have been in auto accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must perform a detailed history and legitimate evaluation to arrive at a legitimate diagnosis.

42.    Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a treatment plan tailored to the unique circumstances of the patient.  During the course of treatment, licensed professionals should modify treatment plans based upon the unique circumstances of each patient and the response (or lack thereof) of individual patients.

43.    Legitimate treatment plans for patients with soft tissue injuries such as strains or sprains may involve no treatment at all because many of these kinds of injuries resolve without any intervention, or may require a variety of interventions, including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

44.    Passive modalities do not require any affirmative effort or movement by patients.  There are many kinds of passive modalities, including:  (a) hot/cold packs, (b) ultrasound, (c) e-stim, (d) manual therapy, (e) massage, and (f) traction.

45.    Active modalities require affirmative movement by patients and include a wide variety of exercises, strengthening, and stretching tailored to the unique circumstances of each patient, including the nature and location of the

injuries, the physical abilities of patients, and their responses (or lack thereof) to any particular active modality on any day or over time.

46.     In legitimate treatment plans, passive modalities are typically used only to the extent necessary to reduce pain and facilitate the patient's ability to engage in active modalities, and active modalities are introduced as soon as practicable to promote the resolution of symptoms.  Therefore, while one or more passive modalities may be medically necessary on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the combination of four or more passive modalities on nearly every visit would rarely, if ever, be appropriate for any patient, let alone for almost every patient.

47.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various services, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment, or lack thereof.

48.     Treatment plans should be periodically reassessed and modified (or discontinued) based upon the progress of the patient, or lack thereof.  To the extent that diagnostic tests such as x-rays and MRIs are medically necessary and are

performed, the results should be integrated into the diagnosis and treatment plans for patients.

49.     Patients should be discharged from treatment when they have reached maximum medical improvement ("MMI"), such that no further treatment is likely to benefit the patient.

50.     The above-described process of evaluation, diagnosis, and treatment must be appropriately documented for the benefit of:  (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Mutual, so that they can pay for reasonable and necessary treatment.

51.     As described below, the Provider Defendants' patients are not legitimately evaluated or treated for their unique conditions and needs.  Instead, they are subjected to the Predetermined Protocol in which they receive virtually the same laundry list of services on every visit to exploit their No-Fault Benefits and enrich the Clinics and their owners, rather than to address their unique conditions and needs.

52.     In addition to the predetermined course of care purportedly rendered to each patient, there are pervasive patterns in the documentation associated with

the Provider Defendants' purported evaluation and treatment of those patients. The Provider Defendants have submitted, or caused to be submitted, this documentation to State Farm Mutual in support of bills for services purportedly provided to patients. The documentation is not credible and is fraudulent because it reflects services that were either not performed or performed pursuant to the Predetermined Protocol, not because such services were medically necessary to address the unique conditions and needs of each patient.

### C.     The Provider Defendants' Fraudulent Evaluations and Treatment

53.    Defendants Hemal Bhagat and Payal Bhagat have collectively subjected nearly all State Farm Mutual patients treating at the Clinics to a predetermined course of treatment. Patients begin their treatment at the Clinics either after Hemal Bhagat or Payal Bhagat evaluate them initially or after they are referred to the Clinics by licensed health care providers, such as medical doctors, pursuant to prescriptions for physical therapy services.[1] Regardless of (a) the unique characteristics of each patient, including his or her age, physical condition, or social, family, and medical history; (b) any information contained in the

---

[1] Prior to January 2015, Michigan law provided a physical therapist could only treat a patient if a licensed health care provider, such as a medical doctor, had specifically prescribed physical therapy for the patient. *See* Mich. Pub. Health Code § 333.17820(1) (2009). Starting in January 2015, physical therapy providers in Michigan can begin treating a patient without a physical therapy prescription, but can only treat the patient for a maximum of 10 visits or 21 days, at which point further services require a prescription from a licensed health care provider. *See* Mich. Pub. Health Code § 333.17820(1) (2015).

patient's prescription for physical therapy; (c) any treatment the patient previously received from other health care providers; or (d) the length of time between the patient's motor vehicle accident and his or her first visit to the Clinics, Hemal Bhagat and Payal Bhagat prepare reports containing the same non-credible findings for virtually all patients and then purport to provide at least five or six identical modalities to almost every patient on almost every visit.

### 1.   Precious's and Sterling's Fraudulent Initial Evaluations

54.   At Precious, Hemal Bhagat served as the only physical therapist and purported to document his initial evaluations in reports submitted to State Farm Mutual to support Precious's charges for physical therapy evaluations.   After Precious abruptly closed and Sterling opened in the same location, Hemal Bhagat and later Payal Bhagat purported to document their initial evaluations at Sterling on paperwork identical to Precious and likewise submitted their reports to State Farm Mutual to support Sterling's charges for physical therapy evaluations. Collectively, these reports (the "Precious and Sterling Initial Evaluations") purported to summarize each patient's subjective complaints, examination findings, and diagnoses, among other information.   Representative examples of the Precious and Sterling Initial Evaluations are attached as Exs. 9 and 10, respectively.

55.     The Precious and Sterling Initial Evaluations reflect non-credible patterns of patient complaints and examination findings that are the same or similar across virtually all patients, and that are designed to justify the predetermined course of treatment provided to patients at Precious and Sterling.

56.     As an initial matter, the Precious and Sterling Initial Evaluations almost always reflect that patients had no limitations in performing activities of daily living ("ADLs") prior to their accidents, but had several functional limitations following their accidents, typically including dressing themselves, walking, and/or moving around in bed.  Ex. 2A, columns I-J.

57.     In addition, the Precious and Sterling Initial Evaluations contain several non-credible examination findings that are repeated across virtually every report.   Specifically, the reports reflect that virtually every patient: (a) has decreased range of motion ("ROM") in every plane measured in both the cervical and lumbar regions of the spine, with nearly all patients purportedly having identical ROM limitations on the right and left sides of their cervical and lumber spines (Ex. 2A, columns K-L); (b) experiences muscle weakness in all cervical and lumbar muscles tested, almost always at severely diminished levels of 3/5 (*id.*, columns M-P); (c) is "mod independent" and "guarded" with transfers and bed mobility, both of which "require[] extra time" (*id.*, columns Q-R); (d) is "mod independent" with regard to gait, exhibiting a "flexed, slow cadence" (*id.*, column

S); (e) has normal findings for sensory and reflex testing (*id.*, columns T-U); (f) has pain in his or her piriformis muscle – one of several muscles located in the buttock – but not in any other muscle in the buttock, which is a virtually impossible finding to make in isolation (*id.*, column V); (g) has positive findings for the Slump Test and Straight Leg Raise Test ("SLR Test"), but a negative finding for the Foraminal Compression Test (*id.*, columns W-Y); and (h) reports no complaints of radiating pain (*id.*, column Z).

58.   The patterns with respect to the patients' muscle strength are particularly striking.  When the Precious and Sterling Initial Evaluations purport to document muscle testing, Hemal Bhagat and Payal Bhagat *always* conclude that patients suffer from decreased muscle strength in every cervical and lumbar muscle they purportedly test.  Ex. 2A, columns M-P.  Specifically, Hemal Bhagat and Payal Bhagat indicate that *every* patient tested has decreased muscle strength levels, often either 3/5 or +3/5, in cervical flexion, extension, side bending, and rotation, and lumbar flexion, extension, side bending, and rotation.  Furthermore, those patients also purport to have decreased muscle strength in every other muscle tested in their upper and lower extremities, including their shoulders, elbows, wrists, hips, knees, and ankles.

59.   These are highly unusual test results.  A patient with 3/5 or +3/5 muscle strength can move his or her muscles against gravity but cannot support

any additional force, including body weight.  Moreover, depending on the muscle group affected, the patient could not lift an object, stand, walk, or rise from a chair. For example, a patient with 3/5 or +3/5 muscle strength in the cervical and lumbar muscles would not be able to lift or turn his or her head or stand upright, and would fall over and be unable to get back up due to his or her weakness.  In other words, if the strength findings were accurate, it is highly unlikely that Precious and Sterling patients would even be able to perform the therapeutic exercises that Hemal Bhagat and Payal Bhagat routinely prescribed for them.

60.    These unusual strength findings are also inconsistent with other routine findings on the Precious and Sterling Initial Evaluations.  For instance, in a population of patients with predominately 3/5 or +3/5 muscle strength, a significant portion (if not all) would exhibit decreased reflexes and/or have impaired sensory function.  Yet the Precious and Sterling Initial Evaluations almost never report decreased reflexes or impaired sensory function in the patients from those Clinics.  Ex. 2A, columns T-U.

61.    Moreover, it is virtually impossible that nearly all patients would experience decreased muscle strength across their entire spine, their bilateral upper extremities, and their bilateral lower extremities.  Indeed, certain Precious and Sterling patients reported with symptoms affecting only a single extremity and yet the Precious and Sterling Initial Evaluations document decreased strength across

their entire bodies.  For example, on June 2, 2016, Hemal Bhagat prepared a Sterling Initial Evaluation for patient M.M., a 62-year-old female, who reported only complaints in her right knee.  Ex. 11 at 1.  Although Hemal Bhagat diagnosed her with only "right knee pain," he nevertheless purported to find decreased strength across M.M.'s bilateral cervical and lumber spinal regions, shoulders, elbows, wrists, hips, ankles, and left knee.  *Id.* at 2.  Such findings do not reflect the results of legitimate evaluations, but instead reflect the intentional efforts of Hemal Bhagat and Payal Bhagat to make Precious and Sterling patients appear seriously injured to justify their predetermined course of treatment.

62.    Moreover, for certain patients, the routine strength deficits documented in the Precious and Sterling Initial Evaluations are inconsistent with contemporaneous reports from the patients' prescribing physicians.  For instance, patient S.A. was evaluated by a physician on November 1, 2016, who found her motor strength in the cervical spine was "normal" and did not even perform any motor testing on the lumbar spine because no lumbar symptoms were documented.  Ex. 12 at 2.  After the physician referred S.A. for physical therapy, she received an initial evaluation at Sterling on the same day, and the corresponding report prepared by Payal Bhagat documents severely diminished strength ratings of 3/5 in all cervical muscles and 3+/5 in all lumbar muscles.  *Id.* at 4.

63.    The patterns within the orthopedic test findings (Slump Test, SLR Test, and Foraminal Compression Test) are likewise non-credible.  The Slump Test can be used to assess whether issues such as a herniated disc or neural tension are contributing to a patient's back or lower extremity symptoms.  The Slump Test is performed on a patient while in a seated position and involves several maneuvers, one or more of which may evoke a positive or negative response.   Although virtually none of the Precious and Sterling patients have complained of pain that radiates into his or her lower extremities (Ex. 2A, column Z), the Precious and Sterling Initial Evaluations nearly always document that the Slump Test is performed.  Furthermore, when that test is performed, Hemal Bhagat and Payal Bhagat always document the result as positive, which is of course inconsistent with the fact that virtually none of the patients complain of radiating pain (*id.*, column X).   Moreover, when a Slump Test is positive, the provider should record the specific position at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms, and to establish a baseline to assess the patient's progress, or lack thereof, over time.  Hemal Bhagat and Payal Bhagat never document this important information from the Slump Test in the Precious or Sterling Initial Evaluation for any patient.

64.     Like the Slump Test, the SLR Test generally should be performed when a patient complains of pain that radiates into his or her lower extremities. The test is performed by having the patient lay on his or her back, and the doctor lifts each leg while the patient's knee remains straight.  If the patient experiences pain down the leg when it is lifted, then the test is positive and indicates the presence of nerve root tension in the lumbar spine, a condition often associated with a disc protrusion and/or a radiculopathy.  Like the Slump Test, the Precious and Sterling Initial Evaluations virtually always document that the SLR Test was performed, even though almost none of the Precious and Sterling patients complain of radiating pain.  *Id.*, column Z.  Furthermore, when the test is performed, Hemal Bhagat and Payal Bhagat always document the result as positive, which is again inconsistent with the fact that virtually none of the Precious and Sterling patients complain of radiating pain.  *Id.*, column W.  Moreover, like the Slump Test, when an SLR Test is positive, the provider should record the affected leg and the angle (in degrees) at which the test elicited pain, as well as the nature, degree, and distribution of the pain to isolate the location and degree of the injury or condition contributing to the patient's symptoms, and to establish a baseline to assess the patient's progress, or lack thereof, over time.  Similar to their findings on the Slump Test, Hemal Bhagat and Payal Bhagat never document this important

information from the SLR Test in the Precious or Sterling Initial Evaluation for any patient.

65.     The Foraminal Compression Test is a test for the cervical spine, and it generally should be performed when a patient complains of pain that radiates into his or her upper extremities.  The test is performed by having the patient extend and rotate his or her neck while the doctor applies downward pressure on his or her head.  If the patient experiences pain during one of the maneuvers while the doctor applies downward pressure on his or head, then the test is positive and suggests that the patient's nerve root is compressed and contributing to his or her radiating pain.  Although virtually none of the Precious and Sterling patients have complained of pain that radiates into their upper extremities (Ex. 2A, column Z), the Precious and Sterling Initial Evaluations nearly always document that the Foraminal Compression Test is performed and always indicate that the finding is negative, which is not credible across all patients.  *Id.*, column Y.

66.     Although there are numerous orthopedic tests that providers can and should use to diagnose the injuries or conditions contributing to their symptoms, depending on the unique circumstances of each patient, the Precious and Sterling Initial Evaluations do not document the performance of any orthopedic test other than the three described above.  Additionally, the Precious and Sterling Initial Evaluations invariably purport to find the same results – positive Slump Test and

SLR Test but negative Foraminal Compression Test – for every patient, which is not credible across a diverse patient population of varying ages, physical characteristics, symptoms, histories, and limitations. *Id.*, columns W-Y. Indeed, these findings suggest that virtually all patients experience nerve root tension in their lower back (despite the lack of radiating symptoms), but none experience nerve root tension or radiating symptoms in their neck.

67.    Regardless of the examination findings documented in the Precious and Sterling Initial Evaluations, Hemal Bhagat and Payal Bhagat nearly always conclude the patient's rehab potential is "[g]ood" to justify the prescribed Predetermined Protocol. Ex. 2B, column I. Furthermore, they rarely reach a diagnosis beyond generalized findings of pain in the affected areas and a generic list of "patient problems," which amount to nothing more than symptoms with no indication of their cause. Specifically, virtually every patient suffered from the same set of patient problems, including:  (a) "pain"; (b) "decreased ROM"; (c) "decreased strength"; (d) "impaired functional mobility"; and (e) "abnormal posture." *Id.*, columns J-N.

68.    The Precious and Sterling Initial Evaluations purport to document nearly identical treatment recommendations for every patient, regardless of the patient's unique circumstances, or the length of time between the patient's motor vehicle accident and his or her initial evaluation at Precious and Sterling.

Specifically, the Precious and Sterling Initial Evaluations virtually always recommend that patients treat three times a week and receive the same eight therapies, consisting of (a) hot packs; (b) e-stim; (c) therapeutic exercise; (d) massage; (e) manual techniques; (f) functional training; (g) gait training; and (h) ultrasound. *Id.*, columns O-V. These recommended therapies do not constitute a legitimate treatment plan. Rather, they are a laundry list of potential therapies which have no real relevance because the actual treatment plan is to provide all patients with the Predetermined Protocol regardless of their unique needs. *See supra* ¶¶ 40-52. Moreover, the routine list of eight therapies do not even accurately reflect the services patients purportedly receive. Although the Precious and Sterling Initial Evaluations list the same eight therapies for every patient, none of the 63 Precious and Sterling patients at issue received the recommended combination of eight therapies on any of the 2,254 visits at issue.[2]

---

[2] Hemal Bhagat and Payal Bhagat virtually never provided three recommended therapies – "manual techniques," "gait training," and "functional training" – to Precious and Sterling patients throughout the course of their care, despite their finding that virtually all patients had an antalgic (abnormal) gait, limitations with walking and moving around, and limited ADLs. Instead, Hemal Bhagat and Payal Bhagat purported to provide Precious and Sterling patients principally four passive modalities (*i.e.*, hot/cold packs, e-stim, ultrasound, and massage) and at least one non-descript active modality (therapeutic exercises) without providing any explanation for the discrepancy between the recommended treatment and rendered treatment.

69.   The common findings and treatment recommendations across virtually all patients at Precious and Sterling are not credible and are fraudulent. For instance, on April 11, 2016, Hemal Bhagat purported to prepare a Sterling Initial Evaluation for patient O.B., a 32-year-old male, who was involved in a motor vehicle accident two weeks earlier.  *See* Ex. 13.   In his Sterling Initial Evaluation, Hemal Bhagat documented that O.B.:  (a) had "difficulty with walking, gait transfer, bed mobility"; (b) had pain in the low back and neck at 7-8/10 that was "aching, sharp, sore, [and] throbbing"; (c) had decreased ROM in all planes measured across his cervical and lumbar spinal regions, shoulders, hips, and knees; (d) had decreased muscle strength of 3/5 in all muscles tested in his cervical and lumbar spinal regions; (e) had decreased muscle strength in all muscles tested in his shoulders, elbows, wrists, hips, knees, and ankles; (f) experienced pain in his piriformis muscle, but not in any other muscle in his buttock; (g) had positive findings on the Slump and SLR Tests but a negative finding on the Foraminal Compression Test; and (h) had "good" rehab potential.  *Id.* at 1-3.  Based on the foregoing findings, Hemal Bhagat recommended that O.B. receive the eight distinct therapies laid out above.  *Id.*  Following his initial evaluation, O.B. treated with Sterling on 101 visits over the span of nine months and never received the combination of eight recommended treatments; instead, O.B. received the same four passive modalities in addition to non-descript therapeutic exercises on nearly

every date of service.  On December 9, 2016, after nine months of treatment, Payal Bhagat prepared a treatment note documenting that O.B. had continued complaints of soreness, fatigue, and stiffness, and should continue receiving the same treatment.  *Id.* at 4.

70.    O.B. was involved in a second motor vehicle accident on December 11, 2016.  On December 13, 2016, Payal Bhagat prepared a new Sterling Initial Evaluation for O.B. that documented virtually identical complaints, findings, and recommendations made by Hemal Bhagat in O.B.'s evaluation eight months earlier, namely that O.B.:   (a) had "difficulty with walking, gait transfer, bed mobility"; (b) had low back and neck pain at 6-7/10 (as opposed to 7-8/10) that was "aching, sharp, sore, [and] throbbing"; (c) had decreased ROM across his cervical and lumbar spinal regions, shoulders, hips, and knees; (d) had decreased muscle strength of +3/5 (as opposed to 3/5) in all muscles tested in his cervical and lumbar spinal regions; (e) had decreased muscle strength across his cervical and lumbar spinal regions, shoulders, elbows, wrists, hips, knees, and ankles; (f) experienced pain in his piriformis muscle, but not in any other muscle in his buttock; (g) had positive findings on the Slump Test and SLR Test but a negative finding on the Foraminal Compression Test; (h) had "good" rehab potential; and (i) based on the foregoing findings, required the eight distinct therapies laid out above.  *Id.* at 5-7.

71.    O.B.'s December 13th Sterling Initial Evaluation listed the same problems and recommended the same treatment modalities at the same frequency (three times per week) as his April 11, 2016 Sterling Initial Evaluation, despite the extensive amount of treatment O.B. had purportedly received at Sterling for his prior accident.  Furthermore, the December 13th Sterling Initial Evaluation made no mention of the prior treatment O.B. purportedly received at Sterling.  O.B. ultimately treated at Sterling for seven subsequent visits, receiving the same four passive modalities in addition to non-descript therapeutic exercises that he received at Sterling for treatment related to his first accident.

72.    Given the same or similar examination findings and problems appear across nearly all of the Precious and Sterling Initial Evaluations, such evaluations do not reflect legitimate examination results, but instead reflect predetermined findings that Hemal Bhagat and Payal Bhagat used to justify the need for all patients to undergo the Predetermined Protocol.

### 2.    Core's Fraudulent Initial Evaluations

73.    After Sterling abruptly closed and Core opened in the same location, Payal Bhagat began to document her initial evaluations at Core on new paperwork that Core submitted to State Farm Mutual to support its charges for physical therapy evaluations.  These initial evaluations (the "Core Initial Evaluations"), despite differing in appearance from the Precious and Sterling Initial Evaluations,

likewise reflect non-credible patterns of patient complaints and examination findings that are the same or similar across virtually all patients, and that are designed to justify the predetermined course of treatment. Representative examples of the Core Initial Evaluations are attached as Ex. 14.

74. The Core Initial Evaluations, in many instances, reflect even more striking patterns than those evident in the Precious and Sterling Initial Evaluations. For instance, the Core Initial Evaluations reflect that virtually all patients suffer from numerous functional limitations (as opposed to a few) following their accidents. Ex. 3A, columns I-L. The functional limitations almost always purport to be extensive, as reflected in the Core Initial Evaluation for patient S.S.:

**Current Functional Limitations:**
**Self Care:**  Hygiene: Grooming [Washing Body Parts, Washing Whole Body, Drying Oneself, Caring for Skin, Caring for Hair, Caring for Nails (Toe & Finger)], Dressing [Putting on Clothes, Putting on Footwear, Putting on Appropriate Clothing, Removing Clothes, Removing Footwear], Bathing [Showering, Bathing, Washing Body Parts, Drying Oneself]; Sleep: Disturbed Sleep; IADLs: Shopping, Food Preparation, Housekeeping, Laundry; Household Chores: Cook a Meal, Laundry
**Mobility: Walking & Moving Around:**  Walking: Forward, Backward, Sideways, Strolling, Walking on Different Surfaces, Walking Around Obstacles

Ex. 15 at 1.

75. Functional limitations such as these, which are documented across the vast majority of the Core Initial Evaluations, are typically associated with stroke victims or patients with spinal cord injuries, not the types of soft tissue injuries associated with Core's patients.

76. In addition, the Core Initial Evaluations document non-credible examination findings that are repeated across patients including:  (a) abnormal

gaits (Ex. 3A, column M); and (b) when tested, decreased ROM in every plane measured in the cervical and lumbar regions of the spine, with numerous patients purportedly having identical ROM limitations on the right and left sides of their cervical and lumber spines (*id.*, columns N-O).

77.    Furthermore, like the Precious and Sterling Initial Evaluations, when the Core Initial Evaluations purport to perform and document muscle testing, they virtually always find that patients suffer from decreased muscle strength (almost always either -3/5 or 3/5) in all cervical and lumbar muscles purportedly tested, among other areas of the body.  *Id.*, columns P-S.  Like at Precious and Sterling, Payal Bhagat never meaningfully comments upon these highly unusual test results, and it is virtually impossible that almost every Core patient would suffer from such potentially serious decreases in muscle strength across his or her spine and other muscle groups.

78.    Indeed, like at Precious and Sterling, the Core Initial Evaluations for certain patients reveal strength findings that are inconsistent with contemporaneous reports from the patients' prescribing physicians.  For instance, patient S.I. was evaluated by a physician on August 10, 2017, who found that her motor strength in the cervical spine was "normal."  Ex. 16 at 2.  After the physician referred S.I. for physical therapy, she received an initial evaluation at Core four days later and the

corresponding report prepared by Payal Bhagat documents severely diminished strength ratings of "3-/5" in all cervical muscles.  *Id.* at 7.

79.    Like the Precious and Sterling Initial Evaluations, the Core Initial Evaluations almost never reach a meaningful diagnosis beyond generalized findings of pain in the affected areas and a generic list of "patient problems," including "pain," "stiffness," and "muscle weakness."[3]  Ex. 3B, columns I-K.  Also like the Precious and Sterling Initial Evaluations, the Core Initial Evaluations virtually always find the patient's rehab potential is "[g]ood," and they go even further to note that patients have no contraindications to physical therapy to further justify recommendations for the Predetermined Protocol.  *Id.*, columns M-N.

80.    Although the Core Initial Evaluations share many of the same patterns as the Precious and Sterling Initial Evaluations, certain tests and findings virtually always documented in the Precious and Sterling Initial Evaluations are no longer documented in the Core Initial Evaluations.  For example, Payal Bhagat no longer documents in the Core Initial Evaluations whether patients had any (a) pain in the piriformis muscle, (b) radiating pain, or (c) sensory or reflex deficits, although she considered such findings to be material to her treatment decisions at Sterling and routinely documented results for them.  Additionally, the Core Initial Evaluations

---

[3] Notably, unlike the Precious and Sterling Initial Evaluations, the Core Initial Evaluations no longer formally list as patient problems "decreased ROM"; "decreased strength"; "impaired functional mobility"; and "abnormal posture."

no longer routinely document results for the Slump, SLR, or Foraminal Compression Tests, but instead only periodically document positive results for the Slump Test, SLR Test, and "Compression/Distraction" tests, which have no apparent impact on the treatment recommended or received.

81.     Based on the foregoing findings, the Core Initial Evaluations virtually always recommend that patients treat three times a week for four weeks and receive the same seven therapies:  (a) therapeutic exercise; (b) therapeutic activity or gait training; (c) massage; (d) patient education; (e) e-stim; (f) ultrasound; and (g) hot packs.  *Id.*, columns L, O-V.  As was the case with the Precious and Sterling Initial Evaluations, these seven recommended therapies do not constitute a legitimate treatment plan.  Rather, they provide a laundry list of potential therapies which have no relevance because the actual treatment plan is to provide all patients with the Predetermined Protocol regardless of their unique needs.  *See supra* ¶¶ 41-52.  Moreover, like at Precious and Sterling, the routine list of seven therapies do not even accurately reflect the services patients purportedly receive.[4]

_____

[4] Although the Core Initial Evaluations routinely recommend patient education, Core never bills for that modality.  Instead, Payal Bhagat purports to provide Core patients principally four passive modalities (*i.e.*, hot/cold packs, e-stim, ultrasound, and massage) and two non-descript active modalities (therapeutic exercises and therapeutic activities/gait training) without providing any explanation for the discrepancy between the recommended treatment and rendered treatment. Notably, although manual techniques and functional training were virtually always recommended in the Precious and Sterling Initial Evaluations (although rarely provided), Payal Bhagat no longer recommends those treatments for Core patients.

82.     As was the case with the Precious and Sterling Initial Evaluations, the common findings and treatment recommendations across virtually all patients in the Core Initial Evaluations are not credible and are fraudulent.  For example, patients S.S., a 46-year-old male, and H.Y., a 37-year-old female, were purportedly involved in the same accident on June 12, 2017.  On July 6, 2017, Payal Bhagat purported to prepare a Core Initial Evaluation for S.S. that diagnosed him with cervicalgia and low back pain.  Ex. 17 at 1.  The next day, on July 7th, Payal Bhagat purported to prepare a Core Initial Evaluation for H.Y. that diagnosed her with cervicalgia, low back pain, and right leg pain.  *Id.* at 4.  Despite their different ages, characteristics, and histories, the Core Initial Evaluations for S.S. and H.Y. documented the patients shared several identical examination findings, including: (a) functional limitations relating to their self-care, including grooming, dressing, bathing, sleeping, shopping, preparing food, housekeeping, doing laundry, and cooking meals; (b) functional limitations relating to mobility, including walking "forward, backward, sideways, strolling, walking on different surfaces, [and] walking around obstacles"; (c) abnormal gaits that "lack[] full knee extension at heel strike, increased hike during swing, lack[] proper heel strike/toe off"; (d) decreased ROM in all planes in their cervical and lumbar regions; and (e) decreased muscle strength of -3/5 in every muscle tested, including every muscle in their cervical and lumbar regions.  *Id.* at 1-6.  Furthermore, the Core

Initial Evaluations for both patients listed identical problems and recommended the same seven modalities at the same frequency and duration (three times a week for four weeks). *Id.* at 2-3, 5-6. It is not credible that patients of different ages, characteristics, and histories would suffer identical complaints, have identical functional limitations, and have identical examination findings.

83. For those patients who began their treatment at Precious and/or Sterling and continued to treat at Core after it opened, Payal Bhagat purported to document the same non-credible examination findings and recommend the same treatment plans detailed above regardless of the extensive treatment the patient previously received at Precious and/or Sterling. Additionally, Payal Bhagat failed to meaningfully comment upon the patient's previous treatment at Precious and/or Sterling, including whether any changes should have been made based upon the patient's progress (or lack thereof) to such treatment.

84. For example, patient S.N., a 36-year-old female, was involved in an accident on May 12, 2016 and began treating at Sterling seven days later. From May 19th to June 13th, Hemal Bhagat oversaw S.N.'s treatment at Sterling, which consisted of the same four passive modalities (e-stim, hot/cold packs, massage, and ultrasound) and non-descript therapeutic exercises. From June 13th to November 22nd, Payal Bhagat oversaw S.N.'s treatment, which also consisted of the same four passive modalities and non-descript therapeutic exercises. On October 25th,

Payal Bhagat prepared a re-evaluation at Sterling in which she documented that S.N. continued to experience functional limitations including "bending, twisting, long time standing," neck and low back pain (rated 4-5 on a 10-point scale), and muscle weakness and ROM restrictions across her cervical and lumber spinal regions and upper and lower extremities.  Ex. 18 at 1-2.  S.N. ultimately treated with Sterling for 80 total visits over the span of six months, receiving virtually the same treatment on every date of service despite her lack of meaningful improvement.

85.    On January 3, 2017, after Sterling closed and Core opened, Payal Bhagat prepared a Core Initial Evaluation for S.N. documenting new functional limitations and complaints that were not mentioned in any of her Sterling records. Ex. 18 at 4.  According to her Core Initial Evaluation, S.N. now had limitations with grooming, dressing, bathing, sleeping, performing household chores, cooking, doing laundry, and driving, and no longer had limitations bending, twisting, or standing for long periods of time.  *Id.*  Additionally, her Core Initial Evaluation documented a more severe pain level of 7 out of 10.  *Id.*  Despite the fact that S.N. purportedly had more severe complaints of pain and additional functional limitations – and that she continued to experience significant muscle weakness and ROM restrictions across her spine – her Core Initial Evaluation failed to mention that she had already treated with Payal Bhagat for months at Sterling.  *See id.*

Furthermore, her Core Initial Evaluation recommended that she continue to receive virtually the same treatment she received on nearly every visit at Sterling along with an additional modality (gait training), without considering whether any changes should be made given her lack of improvement and worsening pain and functional capacity. *Id.* at 6. S.N. continued to treat at Core for 30 total visits over the span of two months, ending treatment without being discharged with continued complaints of neck and low back pain, functional limitations grooming, dressing, bathing, sleeping, performing household chores, cooking, doing laundry, and driving, and muscle weakness across her spine.

86.    Based on the predetermined subjective complaints and examination findings in the Core Initial Evaluations, Payal Bhagat also prepares and submits to State Farm Mutual plans of care (the "Core Plans of Care") for most Core patients, which purport to summarize patient complaints and examination findings, as well as treatment goals and treatment plans. Representative examples of the Core Plans of Care are attached as Ex. 14.

87.    The Core Plans of Care, like the Core Initial Evaluations, also contain non-credible patterns and are fraudulent. Among other things, they purport to document complaints, prognoses, and short-term goals, which are nearly identical for every patient. It is not credible that a wide and diverse patient population of

varying conditions, limitations, and abilities would share the same set of complaints and problems, and have the same treatment goals.

88.    Given the same or similar examination findings and problems appear across nearly all of the Core Initial Evaluations and Core Plans of Care, such evaluations do not reflect legitimate examination results, but instead reflect predetermined findings that Payal Bhagat uses to justify the need for treatment rendered pursuant to the Predetermined Protocol.

### 3.    The Provider Defendants' Fraudulent Treatment

89.    Regardless of the results of any initial evaluation purportedly performed, any information contained in the patient's prescription for physical therapy, or the length of time between the patient's motor vehicle accident and his or her first visit to the Clinics, Hemal Bhagat and Payal Bhagat have subjected virtually every patient at nearly every visit to the same treatment.  At Precious and Sterling, that treatment has consisted of four or more passive modalities (*i.e.*, hot/cold packs, e-stim, ultrasound, and massage) and at least one non-descript active modality (therapeutic exercises and, for some patients, therapeutic activities or gait training).  *See* Ex. 1.  At Core, that treatment has consisted of the same four passive modalities (*i.e.*, hot/cold packs, e-stim, ultrasound, and massage) and at least *two* non-descript active modalities (therapeutic exercises and therapeutic activities or gait training).  *See id.*  In other words, after Payal Bhagat opened Core

in place of Sterling, she purported to provide (and bill State Farm Mutual for) an additional modality for almost every patient on every date of service.

90.     In most instances, the modalities provided to patients throughout their entire course of treatment at the Clinics are virtually identical, despite the wide range of unique circumstances presented by each patient, including the patient's age, physical characteristics, symptoms, history, ability to participate in treatment, and his or her response thereto.  This combination of treatments, with patients allegedly receiving five or more modalities on nearly every visit, would seldom, if ever, be medically necessary for any patient, let alone for nearly all patients, on every visit.

91.     The Provider Defendants render the same combination of treatments regardless of the length of time between the patient's accident and his or her first visit to the Clinics.  For example, patient G.L. was injured in an accident over *15 years* before her first visit to the Clinics.  Prior to visiting Precious, G.L. treated with at least two other physical therapy providers that provided a combination of predominately passive and occasionally active physical therapy modalities.  On January 27, 2016, Hemal Bhagat prepared a Precious Initial Evaluation for G.L. *See* Ex. 19.  Other than noting that G.L.'s "onset date" was June 22, 2000, the Precious Initial Evaluation fails to mention that G.L. had been receiving medical treatment for injuries sustained in her accident for more than a decade prior to her

first visit. *See id.* Instead, rather than find that G.L. should receive no further physical therapy, or tailoring care to meet G.L.'s needs based on her past physical therapy, the Precious Initial Evaluation reveals many of the same routine findings found across virtually all Precious patients and recommends the same treatments, many of which were identical to the treatments G.L. previously received from her prior physical therapy providers. *Id.* at 2-3. Following her initial evaluation, G.L. continued to treat at Precious, followed by Sterling and Core, receiving virtually the same treatments across a combined 200 visits over the course of 20 months, despite the lack of any meaningful improvement.

92. The Provider Defendants provide the foregoing treatment, if at all, pursuant to the Predetermined Protocol and to increase the charges they can submit to State Farm Mutual to exploit their patients' No-Fault Benefits, not because such treatment is medically necessary to address the unique needs of each patient.

93. To support their fraudulent charges for physical therapy, the Clinics submit daily treatment notes (the "Daily Treatment Notes") along with bills to State Farm Mutual. The Daily Treatment Notes from Precious and Sterling consist of one-page forms that purport to reflect the patients' subjective complaints and response to treatment, although such information is often cursory, incomplete, or missing. Representative examples of the Daily Treatment Notes from Precious and Sterling are attached as Exs. 20 and 21, respectively.

94.     The Core Daily Treatment Notes consist of two-page forms that purport to document the patients' names, dates of service, diagnoses, subjective complaints, functional limitations, treatment received, and assessments, although such information, like that recorded in the Daily Treatment Notes from Precious and Sterling, is often cursory, incomplete, or missing.  Representative examples of the Daily Treatment Notes from Core are attached as Ex. 22.

95.     The Clinics' Daily Treatment Notes fail to meaningfully document each patient's improvement or lack thereof over the course of his or her treatment, and at best reflect generic, nondescript assessments of the patient's condition (*e.g.*, "P[atient] co-operative and participated in skilled PT").  In addition to these generic statements regarding the patient's participation in treatment, the Clinics' Daily Treatment Notes do not meaningfully document how patients tolerated or responded to any of the modalities purportedly received.  *See* Exs. 20-22.

96.     The Clinics' Daily Treatment Notes also purportedly document the treatment each patient received on each visit, but routinely fail to document the specific areas or levels of the patient's spine (*e.g.*, C3-C4, L4-L5).  *See* Exs. 20-22. Likewise, while the Clinics purport to document that patients received some form of active care, including multiple units of therapeutic exercises (CPT Code 97110) and, for almost every Core patient and certain Precious and Sterling patients, additional units of therapeutic activities or gait training (CPT Codes 97530 and

97116, respectively), on virtually every date of service, they rarely provide any meaningful information about those modalities. For Precious and Sterling, the Daily Treatment Notes rarely even document the specific type of exercise or activities purportedly performed, and the Daily Treatment Notes for all three Clinics fail to document (a) the number of repetitions, (b) the amount of weight/resistance applied, or (c) the patient's progress or responses (or lack thereof) to such treatments over time. *See* Exs. 20-22.

97.     Regardless of the patient's progress or responses to the treatment, the Clinics' Daily Treatment Notes virtually always recommend the patient continue with the same predetermined treatment. *See* Exs. 20-22. The Clinics' Daily Treatment Notes also contain little to no evidence of clinical reasoning, nor do they indicate how the patient responded to any particular modality or the rationale for repeating the same or virtually the same combination of five or more modalities on virtually every visit from the beginning to the end of treatment. For example, in the accident described above in paragraph 82, patients S.S. and H.Y. both treated with Core for over 105 treatment sessions across the span of eight months. They received the same treatment modalities on virtually every visit, which consisted of the same passive modalities and non-descript therapeutic exercises and therapeutic activities, and both patients ended treatment on the same day with continued complaints of pain and functional limitations.

98.    Such uniformity of treatment across patients is simply not credible given the wide range of unique circumstances presented by each patient, including each patient's age, physical characteristics, symptoms, history, ability to participate in treatment, and his or her response thereto, and further underscores the fraudulent nature of the Predetermined Protocol.

### 4.    The Provider Defendants' Fraudulent Re-Evaluations

99.    Because patients are unique and respond differently to injuries and treatment, treatment plans should be periodically reassessed and modified, if appropriate.  The Provider Defendants purport to periodically re-evaluate their patients, which they document in re-evaluation reports.  But Hemal Bhagat and Payal Bhagat do not perform legitimate re-evaluations aimed at determining their patients' unique circumstances and needs.  Rather, they prepare reports similar to their initial evaluations with similar non-credible patterns to support the patients' purported ongoing need for physical therapy.

100.    For instance, the re-evaluations at Precious and Sterling ("Precious and Sterling Re-Evaluations") reflect that virtually all patients:  (a) are still injured; (b) continue to experience pain; (c) continue to have decreased ROM in all planes of their cervical and lumbar spinal regions; (d) continue to have decreased strength in all muscle groups tested for the cervical and lumbar spinal regions, among other areas of the body; (e) continue to experience pain in their piriformis muscle, but

not in any other muscle of their buttocks; (f) continue to have positive findings for the Slump and SLR Tests and a negative finding for the Foraminal Compression Test; (g) have not fully met their short- and long-term goals; and (h) require the same treatments at the same frequency (three times per week), even though the treatment already purportedly provided did not result in any meaningful improvement.

101.  With respect to Core's re-evaluations (the "Core Re-Evaluations"), they similarly reflect that patients:  (a) are still injured; (b) continue to experience pain; (c) continue to suffer limitations in performing many ADLs; (d) continue to have decreased ROM in all planes of their cervical and lumbar spinal regions; (e) continue to have decreased strength in all muscle groups tested for the cervical and lumbar spinal regions, among other areas of the body; (f) have not fully met their short- and long-term goals; and (g) require the same treatments at the same frequency (three times per week) and duration (four weeks), even though the treatment already purportedly provided did not result in any meaningful improvement.

102.  The Provider Defendants use these predetermined findings and recommendations, which are documented across virtually all of the re-evaluations, to support patients' purported need for additional physical therapy.  Representative examples of the Precious and Sterling Re-Evaluations are attached as Exs. 23 and

24, respectively, and representative examples of the Core Re-Evaluations are attached as Ex. 25.

103.   Because Michigan has no time or dollar limit on No-Fault Benefits, the Provider Defendants' pattern of re-evaluating patients and determining they still need more of the same treatment typically continues until the patient finally refuses further treatment, the patient decides to treat at a different clinic, or an independent medical examination determines that further treatment is not medically necessary.

104.   Even in instances in which the Clinics cease treating patients, the corresponding documentation reflects that every such patient still had pain and/or other symptoms and had not reached their full treatment goals.  In fact, for many such patients, the documentation expressly states that they are being discharged because they voluntarily decided to end treatment (*i.e.*, "self-discharge") or their insurance benefits were terminated – not because they reached MMI.  Given that many soft tissue injuries often heal naturally with little or no treatment, it is not credible that none of the patients at the Clinics – many of whom treat for more than 50 treatment sessions over the course of many months – meaningfully improve and end treatment with continued complaints of pain and/or other symptoms.

105.   For example, Core patient S.T., a 40-year-old female, was involved in a motor vehicle accident on April 26, 2017, and went to Core for an initial

evaluation two days later.  *See* Ex. 26.   Patient S.T. treated with Core on 50 separate visits across the span of four months, receiving virtually the same treatment modalities on every visit that consisted of four passive modalities and non-descript therapeutic exercises and therapeutic activities.  On August 28, 2017, Payal Bhagat prepared a discharge summary reflecting that S.T. was ending treatment due to a "self-discharge," not because she had reached MMI or had achieved her treatment goals.  *Id.* at 6.   Despite the extensive treatment S.T. purportedly received, her discharge summary reflected that she ended treatment with: (a) continued complaints of neck and low back pain; (b) functional limitations in performing many ADLs; (c) abnormal gait; (d) examination findings including decreased ROM in every plane measured across the cervical and lumbar regions of the spine; and (e) decreased muscle strength of +3/5 across all of the cervical and lumbar muscles that were tested.  *Id.* at 4-6.   Although none of S.T.'s injuries resolved during her four-month course of treatment, Payal Bhagat never meaningfully modified S.T.'s treatment plan or varied the modalities she purportedly received.

### 5.   The Provider Defendants' Fraudulent Billing for Services Not Performed

106.   In addition to submitting fraudulent documentation and bills for treatment that was not medically necessary, the Provider Defendants have also submitted fraudulent documentation and bills for treatment that was not performed

at all.  For instance, patient M.K., a 19-year-old female, purportedly treated at Sterling on 89 separate visits over the span of seven months and purportedly received the same four passive modalities (*i.e.*, hot packs, massage, e-stim, and ultrasound) and non-descript therapeutic exercises on every visit.  Although Sterling submitted charges to State Farm Mutual in the amount of $7,475 for CPT Code 97124 (massage), along with supporting documentation purporting to show she received massage on all 89 visits, M.K. testified that she ***never*** received massage therapy at Sterling.  Ex. 27 at 25; *see* Ex. 1, line 22.

107.  Patient M.J., an 18-year-old male, purportedly treated at Sterling on 24 separate dates of service across the span of two months.  M.J. testified that he never received e-stim or ultrasound during his treatment, and yet Sterling submitted charges to State Farm Mutual in the amount of $4,465 for CPT Code 97032 (e-stim) and CPT Code 97035 (ultrasound), and his Sterling Daily Treatment Notes show that M.J. purportedly received e-stim and ultrasound on nearly every visit.  Ex. 28 at 33; *see* Ex. 1, line 61.  Furthermore, although M.J. testified that he did not perform any stretching exercises during his treatment at Sterling, several of the Sterling Daily Treatment Notes also indicate that he performed stretching exercises.  Ex. 28 at 34.

108.  Furthermore, patient M.H., a 25-year-old female, testified that she never received ultrasound during her treatment at Sterling, but Sterling submitted

$2,185 in bills to State Farm Mutual for CPT Code 97035 and her Daily Treatment Notes purport to show that M.H. received ultrasound during each of her 32 visits to the clinic.  Ex. 29 at 50; *see* Ex. 1, line 46.

109.   At Core, patient N.Y., a 32-year-old female, treated on 36 separate dates of service across the span of three months.  Core submitted charges of $3,420 to State Farm Mutual for CPT Code 97035 (ultrasound), and her Daily Treatment Notes document that N.Y. received ultrasound on every visit.  However, patient N.Y. testified that she never received ultrasound during physical therapy at Core. Ex. 30 at 32-33; *see* Ex. 1, line 89.

### D.   State Farm Mutual's Justifiable Reliance

110.   The Provider Defendants submitted, and caused to be submitted, bills and supporting records falsely representing the Provider Defendants provided services that were medically necessary when, in fact, they either were not provided or were provided pursuant to the Predetermined Protocol and not to address the patients' unique circumstances and needs.

111.  State Farm Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services.  The bills and supporting records the Provider Defendants submitted, and caused to be submitted, to State Farm Mutual in support of the fraudulent charges at issue, combined with

the material misrepresentations described above, were designed to and did cause State Farm Mutual to justifiably rely on them.

112. The Provider Defendants were obligated legally and ethically to act honestly and with integrity. Yet, the Provider Defendants have made material misrepresentations and have taken other affirmative acts to conceal their fraud from State Farm Mutual. Each bill and its supporting documentation, when viewed in isolation, do not reveal their fraudulent nature. Only when the bills and supporting records at issue are viewed together as a whole and over time, do the patterns emerge revealing the fraudulent nature of all the bills and supporting records.

113. As a result, State Farm Mutual has incurred damages of over $1.8 million in No-Fault Benefits that it paid to the Clinics.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### COMMON LAW FRAUD
### (Against Precious and Hemal Bhagat)

114. State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

115. Precious and Hemal Bhagat intentionally and knowingly made or caused to be made fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of bills and related

documentation for services that either were not performed, or were not performed because they were medically necessary to address the unique needs of patients.

116.   The false statements of material fact include that (a) patients were legitimately evaluated to determine the true nature and extent of their injuries and to arrive at a legitimate treatment plan to address their true needs, when they were not; (b) patients were prescribed a course of treatment that was medically necessary, when they were not; and (c) Precious patients received a predetermined course of treatment consisting of at least the same four passive modalities and one non-descript active modality on almost every visit because it was medically necessary, when it was not.   Representative examples of the fraudulent reports, documentation, and bills can be found in Exs. 9, 20, 23, and 31.

117.   Precious   and   Hemal   Bhagat   knew   the   above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

118.   Precious   and   Hemal   Bhagat   made   the   above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

119.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $55,000 in No-Fault Benefits paid to Precious.

WHEREFORE, State Farm Mutual demands judgment against Precious and Hemal Bhagat for compensatory damages, plus interest and costs, and other such relief as this Court deems equitable, just, and proper.

**SECOND CAUSE OF ACTION**
**COMMON LAW FRAUD**
**(Against Sterling, Hemal Bhagat, and Payal Bhagat)**

120.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

121.   Sterling, Hemal Bhagat, and Payal Bhagat intentionally and knowingly made or caused to be made fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of bills and related documentation for services that either were not performed, or were not performed because they were medically necessary to address the unique needs of patients.

122.   The false statements of material fact include that (a) patients were legitimately evaluated to determine the true nature and extent of their injuries and to arrive at a legitimate treatment plan to address their true needs, when they were not; (b) patients were prescribed a course of treatment that was medically necessary, when they were not; and (c) Sterling patients received a predetermined course of treatment consisting of at least the same four passive modalities and one non-descript active modality on almost every visit because it was medically

necessary, when it was not. Representative examples of the fraudulent reports, documentation, and bills can be found in Exs. 10, 21, 24, and 32.

123. Sterling, Hemal Bhagat, and Payal Bhagat knew the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

124. Sterling, Hemal Bhagat, and Payal Bhagat made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

125. As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $765,000 in No-Fault Benefits paid to Sterling.

WHEREFORE, State Farm Mutual demands judgment against Sterling, Hemal Bhagat, and Payal Bhagat for compensatory damages, plus interest and costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CAUSE OF ACTION
### COMMON LAW FRAUD
### (Against Core and Payal Bhagat)

126. State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

127. Core and Payal Bhagat intentionally and knowingly made or caused to be made fraudulent statements of material fact to State Farm Mutual by submitting,

and causing to be submitted, thousands of bills and related documentation for services that either were not performed, or were not performed because they were medically necessary to address the unique needs of patients.

128.   The false statements of material fact include that (a) patients were legitimately evaluated to determine the true nature and extent of their injuries and to arrive at a legitimate treatment plan to address their true needs, when they were not; (b) patients were prescribed a course of treatment that was medically necessary, when they were not; and (c) Core patients received a predetermined course of treatment consisting of at least the same four passive modalities and two non-descript active modalities on almost every visit because it was medically necessary, when it was not.  Representative examples of the fraudulent reports, documentation, and bills can be found in Exs. 14, 22, 25, and 33.

129.   Core and Payal Bhagat knew the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

130.   Core and Payal Bhagat made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

131.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $1 million in No-Fault Benefits paid to Core.

WHEREFORE, State Farm Mutual demands judgment against Core and Payal Bhagat for compensatory damages, plus interest and costs, and other such relief as this Court deems equitable, just, and proper.

### FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Against Precious and Hemal Bhagat)

132.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

133.   State Farm Mutual conferred a benefit upon Precious and Hemal Bhagat by paying claims submitted by and on behalf of them, and Precious and Hemal Bhagat voluntarily accepted and retained the benefit of those payments.

134.   Because Precious and Hemal Bhagat knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation that were fraudulent for services that were not performed or were not performed because they were medically necessary, circumstances are such that it would be unjust and inequitable to allow Precious and Hemal Bhagat to retain the benefit of the monies paid.

135.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Precious and Hemal Bhagat have been unjustly enriched by more than $55,000.

WHEREFORE, State Farm Mutual demands judgment against Precious and Hemal Bhagat for compensatory damages, plus interest and costs, and other such relief as the Court deems equitable, just, and proper.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (Against Sterling, Hemal Bhagat, Payal Bhagat, Gazguz, and Sesi)

136.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

137.   State Farm Mutual conferred a benefit upon Sterling, Hemal Bhagat, Payal Bhagat, Gazguz, and Sesi by paying claims submitted by and on behalf of Sterling, Hemal Bhagat and Payal Bhagat, and Sterling, Hemal Bhagat, Payal Bhagat, Gazguz, and Sesi voluntarily accepted and retained the benefit of those payments.

138.   Because Sterling, Hemal Bhagat, and Payal Bhagat knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation that were fraudulent for services that were not performed or were not performed because they were medically necessary, circumstances are such that it would be unjust and inequitable to allow Sterling, Hemal Bhagat, Payal Bhagat, Gazguz, and Sesi to retain the benefit of the monies paid.

139.    As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Sterling, Hemal Bhagat, Payal Bhagat, Gazguz, and Sesi have been unjustly enriched by more than $765,000.

WHEREFORE, State Farm Mutual demands judgment against Sterling, Hemal Bhagat, Payal Bhagat, Gazguz, and Sesi for compensatory damages, plus interest and costs, and other such relief as the Court deems equitable, just, and proper.

**SIXTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Against Core, Payal Bhagat, and Elia)**

140.    State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

141.    State Farm Mutual conferred a benefit upon Core, Payal Bhagat, and Elia by paying claims submitted by and on behalf of Core and Payal Bhagat, and Core, Payal Bhagat, and Elia voluntarily accepted and retained the benefit of those payments.

142.    Because Core and Payal Bhagat knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation that were fraudulent for services that were not performed or were not performed because they were medically necessary, circumstances are such that it would be unjust and

inequitable to allow Core, Payal Bhagat, and Elia to retain the benefit of the monies paid.

143.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Core, Payal Bhagat, and Elia have been unjustly enriched by more than $1 million.

WHEREFORE, State Farm Mutual demands judgment against Core, Payal Bhagat, and Elia for compensatory damages, plus interest and costs, and other such relief as the Court deems equitable, just, and proper.

## SEVENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
## (Against Precious)

144.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

145.   This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

146.   There is an actual case and controversy between State Farm Mutual, on one hand, and Precious, on the other hand, as to all charges for patients who purportedly received services performed at Precious that have not been paid.  State Farm Mutual contends Precious is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

147. Because Precious has knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that it has submitted to State Farm Mutual, it is not entitled to any reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring Precious is not entitled to reimbursement for any of the unpaid charges for services purportedly performed at Precious submitted to State Farm Mutual to date and through the trial of this case, and for supplementary relief, interest, and costs as this Court deems equitable, just, and proper.

## EIGHTH CAUSE OF ACTION
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
## (Against Sterling)

148. State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

149. This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

150. There is an actual case and controversy between State Farm Mutual, on one hand, and Sterling, on the other hand, as to all charges for patients who purportedly received services performed at Sterling that have not been paid. State Farm Mutual contends Sterling is not entitled to be paid for any of these unpaid

claims and charges submitted to State Farm Mutual to date and through the trial of this case.

151.   Because Sterling has knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that it has submitted to State Farm Mutual, it is not entitled to any reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring Sterling is not entitled to reimbursement for any of the unpaid charges for services purportedly performed at Sterling submitted to State Farm Mutual to date and through the trial of this case, and for supplementary relief, interest, and costs as this Court deems equitable, just, and proper.

## NINTH CAUSE OF ACTION
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
## (Against Core)

152.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 113 above.

153.   This action is for declaratory relief pursuant to 28 U.S.C. § 2201.

154.   There is an actual case and controversy between State Farm Mutual, on one hand, and Core, on the other hand, as to all charges for patients who

purportedly received services performed at Core that have not been paid. State Farm Mutual contends Core is not entitled to be paid for any of these unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

155. Because Core has knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that it has submitted to State Farm Mutual, it is not entitled to any reimbursement for any unpaid claims and charges submitted to State Farm Mutual to date and through the trial of this case.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring Core is not entitled to reimbursement for any of the unpaid charges for services purportedly performed at Core submitted to State Farm Mutual to date and through the trial of this case, and for supplementary relief, interest, and costs as this Court deems equitable, just, and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

DATED this 21st day of March, 2019.

KATTEN MUCHIN ROSENMAN LLP


By: _____/s/ Jared T. Heck_____
Ross O. Silverman (IL 6226560)
Jared T. Heck (IL 6289711)
Michael J. Powers (IL 6319443)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com
jared.heck@kattenlaw.com
michael.powers@kattenlaw.com


Thomas W. Cranmer (P25252)
David D. O'Brien (P65532)
Miller, Canfield, Paddock and Stone, PLC
840 West Long Lake Rd., Suite 150
Troy, MI 48098-6356
Tel:  (248) 267-3381
cranmer@millercanfield.com
obrien@millercanfield.com

*Attorneys for Plaintiff State Farm Mutual
Automobile Insurance Company*